# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATHAN MOUSSELLI,           )
                            )
    Plaintiff,              )
                            )
v.                          )    Civil Case No. 14-1901 (RJL)
                            )
ELAINE C. DUKE, Acting Secretary )
of the Department of Homeland Security,[1] )
                            )
    Defendant.              )

**FILED SEP 2 0 2017**
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(September 20, 2017) [Dkt. # 22]

U.S. Department of Homeland Security ("DHS") Special Agent Nathan Mousselli ("plaintiff" or "Mousselli") brings this action against Acting Secretary of DHS Elaine C. Duke ("defendant" or "DHS") to challenge DHS's allegedly unlawful reassignment of Mousselli from a position in Moscow to a position in New York City. *See generally* Am. Compl. [Dkt. # 5]. Plaintiff contends that DHS violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by reassigning him because of his Russian Orthodox religious beliefs and Russian-Ukrainian national origin. DHS counters that it reassigned plaintiff not on the basis of his religion or national origin, but because it received a Top Secret communication from another U.S. agency indicating that plaintiff's safety was at risk in Moscow and recommending his recall to the United States. *See* Def.'s Mem. Supp. Mot. Summ. J. 12-14 [Dkt. # 22].

---

[1] Elaine C. Duke has been appointed to serve as Acting Secretary of the Department of Homeland Security and is automatically substituted as defendant pursuant to Federal Rule of Civil Procedure 25(d).

Currently before the Court is defendant's Motion for Summary Judgment. [Dkt. # 22] Upon consideration of the parties' submissions and the entire record, defendant's Motion for Summary Judgment is GRANTED.

## BACKGROUND

The relevant, undisputed facts are as follows. Plaintiff, who is of Russian-Ukrainian national origin and a practicing Russian Orthodox Christian, has been employed as a Special Agent within DHS's Immigration and Customs Enforcement ("ICE") agency since November 2006. Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 1, Decl. of Nathan Mousselli ¶¶ 2-4 ("Mousselli Decl.") [Dkt. # 25-2]. In October 2012, plaintiff was assigned as a Special Agent in ICE's Homeland Security Investigations office in Moscow, Russia. *Id.* ¶ 5. While in Moscow, plaintiff maintained a Top Secret Security Clearance and received commendations and positive performance reviews for his work as a computer forensic analyst. *See id.* ¶¶ 6-7; Pl.'s Opp'n, Ex. 2 [Dkt. # 25-3].

In Moscow, plaintiff also practiced his Russian Orthodox religion, attending Christ the Saviour Cathedral in Moscow. Mousselli Decl. ¶ 9. In Russia, the Orthodox Church is "closely tied with the Russian Government." Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), Ex. 1, Aff. of Sandie Bostick ¶ 4 ("Bostick Aff.") [Dkt. # 28-1]. Indeed, according to plaintiff, Russian President Vladimir Putin attends Christ the Saviour Cathedral on two occasions each year. Mousselli Decl. ¶ 10. Following one of those occasions – Easter 2013 – an e-mail with a picture of plaintiff participating in a Christ the Saviour Cathedral service was circulated among a few DHS and State Department employees. Pl.'s Opp'n, Ex. 3 [Dkt. # 25-4]. In the background of the picture, President Putin can be seen standing

at the front of the service – a fact noted by two of the participants in the e-mail chain. *See id.* at 3 ("[n]ote Putin in the background"); *id.* at 2 (picture "shows who's in charge there").

Over three months later, in late August 2013, then-serving Assistant Director for International Affairs within ICE's Homeland Security Investigations component John G. Connolly received a "Top Secret communication" from another U.S. Government agency. *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex. 1, Aff. of John G. Connolly ¶¶ 3, 5 ("Connolly Aff.") [Dkt. # 22-1]. The communication "provided highly classified reasons for advocating the termination" of plaintiff's assignment in Moscow and "recommended that ICE recall" plaintiff back to the United States. *Id.* ¶ 5. According to Connolly, the contents of the Top Secret communication caused him "to fear for Mr. Mousselli's safety and for national security." *Id.* ¶ 7.

Although Connolly was not typically responsible for personnel issues such as the recall (or "curtailment") of personnel from details, on this occasion the matter had come directly to him given the classified concerns. *Id.* ¶ 6. Connolly determined that it was "prudent to elevate" the matter further to Peter Edge, then-Deputy Executive Associate Director of Homeland Security Investigations. *Id.* Connolly presented the communication to Edge and, after the two conferred, they "agreed that Mr. Mousselli must be recalled to the United States immediately for security reasons" that "were, and remain, classified as Top Secret." Def.'s Mot., Ex. 2, Aff. of Peter T. Edge ¶¶ 5-6 ("Edge Aff.") [Dkt. # 22-1]. Edge also determined that the recall was necessary to "protect ICE's working relationship with the agency that transmitted the classified communication to ICE." *Id.* ¶ 7. Edge believed that, "in light of the highly classified security concerns expressed . . . if ICE did

3

not withdraw Mr. Mousselli from Moscow, Russia, voluntarily and expeditiously, it would have the institutionally embarrassing result of Mr. Mousselli being ordered to return to the United States by order of another U.S. Government entity." *Id.* ¶ 8. According to Connolly and Edge, neither was aware of plaintiff's religion or national origin at the time of the decision. *See id.* ¶ 9; Connolly Aff. ¶ 10.

To implement the recall, Connolly directed his subordinate, Leo Lin, to contact plaintiff and have him return to Washington, D.C. "in order to deliver a brief." Connolly Aff. ¶ 8. Connolly explains, however, that there was never any briefing planned, and that he "stated that Mr. Mousselli was needed for a brief because [he] was not at liberty to reveal the real reasons for recalling Mr. Mousselli to Mr. Mousselli or his managers." *Id.* Once plaintiff was safely in the Washington, D.C. office on August 26, 2013, Connolly informed Lin and another DHS manager that there was no briefing planned and that the briefing "ruse" had been necessary "because it was imperative that no one know Mr. Mousselli was being permanently returned to the United States until he was physically present in the United States." Def.'s Mot., Ex. 3, Aff. of Leo Lin ¶ 7 ("Lin Aff.") [Dkt. # 22-1]. Lin, in turn, immediately passed that information along to plaintiff. *See id.* ¶¶ 7-8.

Following plaintiff's recall, he was reassigned to New York, where he had worked prior to Moscow. *Id.* ¶ 7. There, plaintiff continued to work as a Special Agent and "retained the same pay grade, step, retirement benefits, and employment benefits." *Id.* ¶ 9. Plaintiff was not, however, permitted to return to Russia to gather his belongings, and as a result was separated from his wife and children for roughly one month. Mousselli Decl.

¶¶ 23-24. As a result of his transfer, plaintiff claims to have lost promotional opportunities and suffered transportation and increased housing costs. *Id.* ¶¶ 21-24.

Plaintiff believes that DHS reassigned him "because of" his religious beliefs and national origin in violation of Title VII. Am. Compl. ¶¶ 83, 95. Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission on December 17, 2013, and was informed of his right to file suit on September 19, 2014. *Id.* ¶¶ 67, 70. Plaintiff then filed his two-count Title VII complaint in this Court, which he amended on December 10, 2014. *See generally id.*

## STANDARD OF REVIEW

DHS has moved for summary judgment. Summary judgment is proper when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it is capable of affecting the "outcome of a suit under governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of identifying evidence that demonstrates that there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. Once the moving party has done so, the burden shifts to the nonmoving party – plaintiff in this instance – to identify and "properly support" the "specific facts" showing that there is a genuine issue for trial. *Id.* at 324 (internal quotation

5

marks omitted); *Anderson*, 477 U.S. at 256. If the nonmoving party fails to proffer relevant evidence, the moving party may succeed on summary judgment by citing that "failure of proof." *Celotex Corp.*, 477 U.S. at 323.

When examining a summary judgment motion, a court must accept the nonmoving party's statements as true and view all evidence and inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. Still, the nonmoving party must come forward with more than "a scintilla of evidence" in support of its position on a disputed issue. *Id.* at 252; *see also id.* at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). To survive summary judgment, the nonmoving party may not simply rest upon "mere allegation or denials of his pleading," *id.* at 256, nor on "vague or conclusory" evidence. *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).

## ANALYSIS

Title VII of the Civil Rights of Act of 1964 prohibits an employer from taking an adverse employment action against an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Here, plaintiff claims that DHS violated Title VII's prohibition by reassigning him because of his religion and national origin. DHS counters by articulating and proffering evidence to support a legitimate and non-discriminatory reason for plaintiff's reassignment: A Top Secret communication from another U.S. Government agency, which indicated that plaintiff's safety and national security would be at risk should plaintiff remain in Moscow. With the case in this posture at summary judgment, this Court must "resolve one central question:

Has [plaintiff] produced sufficient evidence for a reasonable jury to find that [DHS's] asserted non-discriminatory reason was not the actual reason and that [DHS] intentionally discriminated against [plaintiff] on the basis" of his religion or national origin? *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). The answer is clearly no.

The undisputed evidence in this case shows that there were two high-level DHS officials responsible for deciding to recall plaintiff from Moscow: John Connolly and Peter Edge. *See* Connolly Aff. ¶ 7; Edge Aff. ¶ 6. The undisputed testimony from those officials is that, in August 2013, Connolly received a Top Secret communication from another U.S. Government agency containing "highly classified reasons for advocating the termination" of plaintiff's detail in Russia, reasons that Connolly said "caused [him] to fear for Mr. Mousselli's safety and for national security." Connolly Aff. ¶¶ 5, 7. Undisputed evidence from Connolly and Edge further shows that, after discussing that communication, Connolly and Edge decided to recall and reassign plaintiff to the United States "for security reasons" and to "protect ICE's working relationship with the agency that transmitted the classified communication." *Id.* ¶ 7; Edge Aff. ¶ 7. Finally, Connolly and Edge both stated in sworn testimony that they were not even aware of plaintiff's religion or national origin at the time of their decision. *See* Connolly Aff. ¶ 10; Edge Aff. ¶ 9.[2]

---

[2] Plaintiff complains that DHS's proffered reason for his reassignment is not sufficiently specific. Pl.'s Opp'n 14-15. Plaintiff is wrong. As explained, Connolly and Edge have provided testimony regarding the communication Connolly received, the fact that the communication raised safety and national security concerns, and their joint decision to recall plaintiff on the basis of those concerns. The exact reasons why Connolly and Edge feared for plaintiff's safety and national security are immaterial (just as DHS's weighing of those risks is most likely non-justiciable, *cf. Dep't of Navy v. Egan*, 484 U.S. 518, 527-28 (1988)). The important point for present purposes is that DHS has come forward with a legitimate, non-discriminatory reason for plaintiff's reassignment, and plaintiff has done nothing to rebut that evidence.

7

Plaintiff has not come forward with *any* direct evidence – much less any "*specific facts*" – to counter Connolly's and Edge's testimony that they were unaware of plaintiff's religion or national origin at the time of the challenged employment action. *Anderson*, 477 U.S. at 256 (emphasis added). That failure alone is fatal to plaintiff's discrimination claims, as it is common sense that a decisionmaker cannot discriminate against an employee on the basis of religion or national origin if the decisionmaker does not know the employee's religion or national origin. *Cf. Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 300-01 (D.C. Cir. 2015) ("race could not have influenced" employment decision when "it [was] undisputed that neither" decisionmaker "knew" employee's race); *accord Washington v. Chao*, 577 F. Supp. 2d 27, 40 (D.D.C. 2008).

In addition, plaintiff has failed to offer specific evidence to show, as he must, that Connolly and Edge's "asserted non-discriminatory reason" – i.e., the Top Secret communication from another U.S. Government agency – "was not the actual reason" for plaintiff's recall and reassignment. *Brady*, 520 F.3d at 494. Nor has plaintiff proffered other types of common "pretext" evidence, such as comparator evidence or evidence to show that individuals of his same religion or national origin were treated poorly by DHS. *See, e.g.*, *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). With no direct evidence to rebut Connolly's and Edge's testimony that they acted on the basis of a classified communication, plaintiff attempts to cobble together a few other pieces of evidence to salvage his pretext showing. Plaintiff fails. How so?

Plaintiff first argues that Connolly's briefing "ruse" is evidence of pretext. I disagree. Connolly explained that the briefing explanation – an explanation given not only

8

to plaintiff, but also to lower level DHS managers – was necessary to ensure that plaintiff was able to make it back to the United States safely. *See* Connolly Aff. ¶ 8. Once plaintiff was safely back in the United States, he was immediately informed that he had been recalled due to a classified communication – an explanation DHS has maintained since that day. *See* Lin Aff. ¶¶ 7-8. Contrary to plaintiff's arguments, this simply is not a case in which DHS has provided the kinds of "inconsistent or dishonest explanations" for its employment action that would support an inference of pretext. *Walker*, 798 F.3d at 1092.

Plaintiff next points to the May 2013 e-mail chain distributed among a few DHS and State Department employees as evidence that plaintiff's managers had knowledge of his religion and acted on the basis of it. *See* Pl.'s Opp'n 17-18. But the undisputed evidence is that Connolly and Edge were the only two decisionmakers in this case. Thus, "[e]ven were" plaintiff able to convince a jury that the e-mail chain is evidence of "discriminatory animus" on the part of some individuals in DHS (as opposed to concern about plaintiff's contact with Russian officials), "no reasonable jury could impute discriminatory intent on [Connolly and Edge's] part" for the other employees' actions. *Holcomb*, 433 F.3d at 900. For the e-mail chain evidence to be probative of pretext, plaintiff would need evidence to show that Connolly and Edge knew of the contents of the May 2013 e-mails. Plaintiff has offered no such evidence. Indeed, the undisputed testimony in this case is that Connolly and Edge were not aware of plaintiff's religion or national origin at the time of their decision. *See* Connolly Aff. ¶ 10; Edge Aff. ¶ 9.

Finally, plaintiff points to his own testimony, in which he claims that certain DHS managers admitted that he was reassigned because of his religious activities.[3] Plaintiff's second-hand statements fail to create a "genuine" dispute that DHS's proffered non-discriminatory reason is pretextual. To start, plaintiff's testimony is vague, conclusory, and non-specific with respect to the alleged discrimination at issue. *Cf. Perez*, 823 F.3d at 710 ("Courts may grant summary judgment to a defendant where a plaintiff's evidence is vague or conclusory."). In no instance do the statements indicate who decided to recall plaintiff on the basis of his religion or national origin, or the basis for the proponents' assertions. That is not surprising, given that all of the managers at issue have provided uncontroverted testimony stating that they had no role in the decision to recall plaintiff, were not briefed prior to plaintiff's recall, and did not discuss the decision with Connolly or Edge. *See* Bostick Aff. ¶¶ 5-9; Def.'s Reply, Ex. 2, Aff. of Peter Fitzhugh ¶¶ 6, 8-10; Def.'s Reply, Ex. 3, Aff. of James Plitt ¶¶ 5, 7.

All of that highlights a bigger problem with plaintiff's testimony: As with the e-mail chain evidence, plaintiff's statements do not present "*specific evidence* suggesting that 'the *decision maker* harbors discriminatory animus.'" *Adeyemi v. D.C.*, 525 F.3d 1222, 1229 (D.C. Cir. 2008) (emphasis added) (quoting *Holcomb*, 433 F.3d at 899). Even putting aside the fact that all of the alleged proponents have provided declarations denying ever

---

[3] Mousselli states that his supervisor, Sandie Bostick, said "that certain individuals are concerned with [his] religious activities with the Russian Orthodox Church"; that another DHS manager, Peter Fitzhugh, told plaintiff "that because of [his] religious activities it was determined that [he] must return to the U.S."; and that DHS Regional Attaché Jim Plitt "informed" plaintiff "that he believed [plaintiff] was brought back to the U.S. because of [his] faith and religious observances while in Moscow." Mousselli Decl. ¶¶ 16, 19, 20.

making the statements plaintiff recites, *see* Def.'s Reply, Exs. 1-4, plaintiff's statements show at the most that some employees with no role in or direct knowledge of the classified report prompting plaintiff's recall engaged in speculation about his reassignment. In short, plaintiff's only "evidence calling the employer's proffered reason into doubt is weak, and the record also contains 'abundant and uncontroverted independent evidence that no discrimination ha[s] occurred.'" *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). In such a case, "judgment in an employer's favor is appropriate." *Id.*

The bottom line is that DHS has produced evidence of a legitimate, non-discriminatory reason for reassigning plaintiff to the United States: High-ranking DHS officials – officials unaware of plaintiff's religion or national origin – received a classified communication indicating that plaintiff's presence in Moscow jeopardized plaintiff's safety and national security, and decided to reassign plaintiff on that basis. Plaintiff has failed to put forward sufficient evidence for a reasonable jury to find that DHS's legitimate, non-discriminatory reason for reassigning plaintiff was a pretext for unlawful religious or national origin discrimination.[4] This is yet another textbook example of Title VII being misused as a sword for personal gain – as opposed to a shield for self-protection against illegal discriminatory conduct. Plaintiff's claims therefore fail as a matter of law.

---

[4] Having reached that conclusion, I need not address DHS's alternative argument that plaintiff's lateral transfer was not an adverse employment action.

11

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge